UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE SEARCH OF:<br><br>WHITE AND GOLD, APPLE IPHONE WITH BLACK COVER, MODEL A1549, IMEI # 358373060271961 | No. 19-MJ-6449-MPK |

**AFFIDAVIT OF LIEUTENANT ERIK TELFORD IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Erik V. Telford, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Massachusetts State Police Officer with over nineteen (19) years of professional experience. I am assigned to the Gang Unit as part of the South Eastern Massachusetts Gang Task Force ("the Task Force"). The Task Force consists of Special Agents ("SA") from the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF"), Troopers from the Massachusetts State Police ("MSP") Gang Unit, and Detectives from the Brockton Police Department. I have been assigned to the Gang Unit for over sixteen (16) years and part of the Task Force for over eight years.

2. In or about January 2008, I was deputized by the FBI as a federal Task Force Officer ("TFO"). As such, I am also an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

3. I have participated in numerous investigations into illicit drug distribution networks and have interviewed defendants, informants, and others who were sellers, distributors or users of narcotics and other illicit drugs. I have been involved in the monitoring, intercepting, and recording of court ordered wiretaps relating to drug investigations. I have participated in numerous search warrants and arrest warrants involving drug trafficking. I have participated in numerous searches of residences, vehicles, and businesses in which controlled substances and paraphernalia, currency, and records relating to drug trafficking were discovered. In addition, I have had the opportunity to speak with and observe other federal and state narcotics officers in matters relating to the manner in which narcotics are possessed, sold, and distributed in the Massachusetts area. I have interviewed hundreds of drug dealers, users and suppliers regarding the illegal distribution of drugs, including street level distribution, and I have observed illegal drug deals taking place.

4. I have participated in narcotics and criminal street gang and narcotics investigations that involved wiretaps, physical surveillance, controlled purchases utilizing undercover officers, confidential informants, and cooperating witnesses, the execution of search warrants, the review of recorded (both audio and video) conversations and criminal activities, and the analysis of telephone, financial and drug records. Through my professional training, education and experience, I have become familiar with the manner in which illegal drugs are prepared, packaged, stored, transported and distributed as well as the method of payment for such drugs.

5. Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such

activities to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined cocaine, cocaine base ("crack"), heroin, and fentanyl as well as other controlled substances. I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade.

6. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## PURPOSE OF AFFIDAVIT

7. This affidavit is being submitted in support of an application for a search warrant for electronic equipment seized from ARIAS-CASTILLO pursuant to his arrest on September 11, 2019: a white and gold colored iPhone with black cover, Model A1549, IMEI # 358373060271961 ("TARGET PHONE" or "the Equipment"), that is in the possession of law

enforcement officials, as described in Attachment A. There is probable cause to believe that the TARGET PHONE is an instrumentality of and contains evidence of violations of 21 U.S.C. § 841(a)(1) (possession and distribution of controlled substances), as described in Attachment B.

8. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other law enforcement officials and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### September 3, 2019

9. On Tuesday, September 3, 2019, officers conducted an undercover narcotics operation in Lawrence, Massachusetts. Troopers Andrew DaSilva and Carol Mansi worked as undercovers ("UCs") with the goal of purchasing narcotics. The UCs were utilizing a UC vehicle and utilizing an audio monitoring device for safety that was not recorded. Several officers in unmarked vehicles conducted surveillance.

10. The UCs made a series of calls and texts to "Willy" at 617-712-9116 in the afternoon and negotiated the sale of "a finger of brown for $250," known to investigators to be approximately 10 grams of heroin/fentanyl. At approximately 3:30pm, the male on the phone directed the UCs to the area of 700 Essex Street in Lawrence, "Market Basket," to meet to make the heroin/fentanyl purchase. The male voice had a Hispanic accent and spoke broken English.

11. The UCs traveled to the Market Basket parking lot in a UC vehicle and parked. At approximately 3:34pm the male "Willy" called the UCs and said he was there. The UCs described their vehicle and the male "Willy" said he was in a Gray Nissan van. Surveillance and

the UCs described a gray Nissan Quest driving in the lot towards the UCs with a Rhode Island registration. The Gray Nissan van parked near the UCs.

12. Tpr. DaSilva exited the UC vehicle and entered the Gray Nissan Van. The occupant, later identified as ARIAS-CASTILLO, was a Hispanic male wearing a baseball hat and purple t-shirt. ARIAS-CASTILLO handed the UC a paper bag and the UC handed the target $250 in U.S. currency "buy money." Tpr. DaSilva opened the paper bag and observed four "fingers" within an outer green plastic wrap.

13. Tpr. DaSilva handed the four "fingers" of fentanyl back to ARIAS-CASTILLO and explained he was paying $250 for one finger. ARIAS-CASTILLO ripped open the green plastic wrap and removed one "finger" and handed it to Tpr. DaSilva. ARIAS-CASTILLO was frustrated and believed the drug deal was for four "fingers," not one.

14. Tpr. DaSilva exited and ARIAS-CASTILLO drove away in the Gray Nissan Van. Tpr. Shea took a photograph of ARIAS-CASTILLO as he drove away and Tpr. DaSilva positively identified the image as the target who had sold him the approximately 10 grams of fentanyl.

15. Tpr. DaSilva handed the evidence to Tpr. McIntyre who logged in and secured the evidence. Tpr. McIntye showed Tpr. DaSilva a digital image of Willin ARIAS-CASTILLO, dob: xx/xx/1984, from a Dominican identification document, more commonly known as a cedula. Tpr. DaSilva positively identified Willin ARIAS-CASTILLO, dob: xx/xx/1984 as "Willy," the target from the Gray Nissan Van who had sold the Tpr. DaSilva the above 10 gram "finger" of fentanyl/heroin for $250. The controlled substance was weighed to be 10.2 grams.

**September 5, 2019**

16. On Thursday, September 5, 2019, officers conducted an undercover narcotics operation in Lawrence, Massachusetts. MSP Troopers Andrew DaSilva and Carol Mansi worked as undercover (UCs) with the goal of purchasing narcotics. The above UCs were utilizing a UC vehicle and utilizing a kel audio monitoring device for safety that was not recorded. Several officers in unmarked vehicles conducted surveillance.

17. The UCs made a series of calls and texts to "Willy" at 617-712-9116 at approximately 6:00pm and negotiated the sale of four fingers of brown for $1000, known to investigators to be approximately 40 grams of heroin/fentanyl. At approximately 6:10pm, a male voice suspected to be "Willy," told the UCs to be at the Market Basket in Methuen in two minutes.

18. The UCs parked at the Market Basket lot and minutes later, ARIAS-CASTILLO wearing a green t-shirt, walked up to and entered the UC vehicle. ARIAS-CASTILLO directed the UCs to park across the street in the car wash. The UCs drove to the car wash, and ARIAS-CASTILLO handed over four clear plastic bags (cylindrical in shape) wrapped in green plastic containing tan powdery substance of suspected heroin/fentanyl packaged into "4 fingers" as agreed. The UCs handed ARIAS-CASTILLO $1,000 in pre-recorded U.S. currency.

19. ARIAS-CASTILLO then exited the UC vehicle and entered a nearby maroon minivan operated by another individual and drove away.

## September 11, 2019

20. On Wednesday, September 11, 2019, officers conducted an undercover narcotics operation in Lawrence, Massachusetts. MSP Troopers Andrew DaSilva and Carol Mansi worked as UCs with the goal of purchasing narcotics. The UCs were utilizing a UC vehicle and utilizing

a kel audio monitoring device for safety that was not recorded. Several officers in unmarked vehicles conducted surveillance.

21. The UCs made a series of calls and texts to "Willy" at 617-712-9116, in order to negotiate the purchase of 12 fingers of "brown," which I know to be approximately 120 grams of heroin/fentanyl. The negotiated price was for $2,800. The UCs agreed to conduct the transaction at the Market Basket parking lot in Methuen, Massachusetts.

22. The UCs proceeded to and parked at the Market Basket lot. ARIAS-CASTILLO arrived driving gray Kia Sportage, Mass. Reg. 369YA2 (the "Gray Kia") and parked near the UC vehicle. Tpr. DaSilva exited the UC vehicle and entered the passenger seat of the Gray Kia, and observed ARIAS-CASTILLO to be operating it. There were no other occupants.

23. While in the Gray Kia, Tpr. DaSilva observed the controlled substances on ARIAS-CASTILLO's lap. The controlled substances were packaged in green plastic wrap. Within the green plastic wrap, Tpr. DaSilva observed twelve clear plastic cylinder-shaped bags of tan/brown powdery substance consistent with heroin/fentanyl. After observing the controlled substances in the vehicle, Tpr. DaSilva stated the code-word alerting other law enforcement officers that he had observed the narcotics and to make the arrest of ARIAS-CASTILLO.

24. At that point, ARIAS-CASTILLO stated "Policia" and drove around the Market Basket parking lot with Tpr. DaSilva still in the vehicle. Officers pursued ARIAS-CASTILLO as he drove. MSP Det. Lt. Aumais and Tpr. DaSilva observed ARIAS-CASTILLO throw the green plastic wrap package out of the driver's window. The Gray Kia driven by ARIAS-CASTILLO then collided head-on with an unmarked police vehicle. At this point officers placed ARIAS-CASTILLO under arrest.

25. That green plastic wrap package containing the twelve clear plastic cylindrical bags of tan/brown powdery substance was recovered by Det. Lt. Aumais. Shortly thereafter, the tan/brown powdery substance was then field-tested and the test indicated positive for fentanyl and/or methamphetamine. The tan/brown powdery substance was also weighed to be 126.46 grams with packaging.

26. At the time of his arrest, investigators searched ARIAS-CASTILLO vehicle and person, and located the TARGET PHONE on ARIAS-CASTILLO's person. Based on ARIAS-CASTILLO's commission of the controlled substance offenses, in violation of 21 U.S.C. 841(a)(1), and his possession of a cellular phone at the time of his arrest, I believe ARIAS-CASTILLO was using the TARGET PHONE in furtherance of the Target Offense and additional drug transactions.

## LOCATION OF THE TARGET PHONE

27. The TARGET PHONE is currently in the custody of agents from FBI, at 201 Maple Street, Chelsea, MA 02150.

## PROBABLE CAUSE TO BELIEVE THAT THE TARGET PHONE CONTAINS EVIDENCE AND INSTRUMENTALITIES OF A CRIME

28. As established above, there is probable cause to believe that ARIAS-CASTILLO committed the violations of 21 U.S.C. § 841(a)(1) and used the TARGET PHONE to participate in and arrange the controlled substance transactions with the UCs on September 3, 2019, September 5, 2019, and September 11, 2019. As noted in the information pertaining to the September 3, 2019 and September 5, 2019 transactions, ARIAS-CASTILLO made contact with the UCs via telephone shortly before the transaction to coordinate the location and provide updates, likely keeping the device on his person during the deals to facilitate these communications.

29. In addition to using the TARGET PHONE to set up drug transactions, ARIAS-CASTILLO likely used the TARGET PHONE to set up purchases of his drug supply. In fact, he possessed over 120 grams of fentanyl at the time of his arrest, which must have been acquired from a source of supply ("SOS"). In my training and experience, drug distributors such as ARIAS-CASTILLO, likely used a cellphone to arrange the larger shipments of illegal drugs, which he then distributes. As such, there is likely a trail of communications concerning the source of the controlled substances that ARIAS-CASTILLO was selling. These communications likely entailed discussion of drug type, drug weight, price, and coordination of payment, delivery dates and locations.

30. As described above, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through text messages, encrypted messages, and photographs.

31. As discussed above, the TARGET PHONE is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the TARGET PHONE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession on September 11, 2019.

32. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of computer "hardware") can now function essentially as small computers. The

TARGET PHONE is a smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

33. Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

34. Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

35. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

36. Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating

system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

37. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

38. Based on the information described above, I believe that the TARGET PHONE, as described in Attachment A, contains evidence, and instrumentalities of drug trafficking, as described in Attachment B.

I, Erik V. Telford, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

_____
Lieutenant Erik V. Telford
Massachusetts State Police
FBI Taskforce Officer

Subscribed and sworn to before me, this 9th day of October, 2019.



_____
Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts

11